Filed 11/20/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| ASSOCIATION FOR LOS ANGELES DEPUTY SHERIFFS,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>COUNTY OF LOS ANGELES et al.,<br><br>Defendants and Appellants. | B331881<br><br>(Los Angeles County Super. Ct. No. 23STCP01745) |

APPEAL from an order of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Affirmed.

Sheppard, Mullin, Richter & Hampton, Jason W. Kearnaghan, Kent R. Raygor and Valerie E. Alter for Defendants and Appellants.

ACLU Foundation of Southern California, Dae Keun Kwon, Tiffany M. Bailey and Mohammad Tajsar as Amicus Curiae on behalf of Defendants and Appellants.

Rains Lucia Stern St. Phalle & Silver, Jacob A. Kalinski, Richard A. Levine and Brian P. Ross for Plaintiff and Respondent.

_____

Finding law enforcement gangs damage the trust, reputation, and efforts to enhance professional standards of policing agencies throughout the state, the California Legislature enacted Penal Code sections 13670 and 13510.8, both effective January 1, 2022.  (Stats 2021, ch. 408, §§ 1, 3; Stats 2021, ch. 409, § 13.)  The former requires law enforcement agencies to "maintain a policy that prohibits participation in . . . law enforcement gang[s] and . . . makes violation of that policy grounds for termination."  (Pen. Code, § 13670, subd. (b).)  It also requires law enforcement agencies to cooperate with investigations into such gangs by an inspector general or other authorized agency.  (*Ibid.*)  The latter authorizes revocation of a peace officer's certification for "serious misconduct," including "[p]articipation in a law enforcement gang" or "[f]ailure to cooperate with an investigation into potential police misconduct." (Pen. Code, § 13510.8, subds. (b)(7) & (b)(8).)

The new legislation did not address or alter pre-existing procedures for officer discipline required by the Meyers-Milias-Brown Act (MMBA) (Gov. Code, § 3500 et seq.), which governs labor-management relations at the local government level. The MMBA requires public employers and employee organizations to meet and confer in good faith over matters within the "scope of representation," which "includ[e, but [are] not limited to, wages, hours, and other terms and conditions of employment," but excludes "consideration of the merits, necessity, or organization of any service or activity provided by law or executive order."  (Gov. Code, § 3504.)

On May 12, 2023, the Office of the Inspector General for the County of Los Angeles (OIG) sent a letter to 35 individual Los Angeles Sheriff's Department (LASD) deputies selected based

on information gleaned from personnel records.  Citing Penal Code sections 13670 and 13510.8, the letter directs the deputies to appear and answer questions about their knowledge of and involvement in law enforcement gangs, to display certain tattoos located on their lower legs or arms, and to provide photographs of such gang-associated tattoos on their bodies.[1]  On May 18, 2023 – six days after the OIG's letter – the Los Angeles County Sheriff Robert Luna sent the deputies his own letter, via email, ordering them to participate in the interviews and warning that refusal to cooperate would be grounds for discipline, including termination.

The union representing the deputies—the Association for Los Angeles Deputy Sheriffs (ALADS)—filed an unfair labor practice claim with the Los Angeles County Employee Relation Commission (ERCOM) and simultaneously sought injunctive relief from the trial court, unavailable in the administrative tribunal, to enjoin the OIG from proceeding with the interviews without first meeting and conferring with ALADS under the MMBA and the Los Angeles County Employee Relations Ordinance (ERO), promulgated pursuant to the MMBA. ALADS further contended the planned interrogations violated deputies' Fourth and Fifth Amendment rights.  The trial court rejected ALADS' constitutional claims but, concluding the interview directive triggered the meet-and-confer obligations under the MMBA, enjoined the OIG's interviews pending adjudication of the unfair labor practice claim or the completion

---

[1]     The letter requested the officer bring photos of such tattoos anywhere on the deputies' bodies, but the OIG subsequently narrowed the scope of the photos to tattoos on the deputies' face, neck, arms (shoulders to hands), and legs (knees down).

3

of the MMBA's meet-and-confer process, whichever came first. This appeal followed.

We conclude the trial court committed no error in determining ALADS showed a probability of prevailing on its claim that the interview directive triggered the duty to meet and confer (or bargain)[2] with ALADS under the MMBA and we find the trial court acted within its discretion in balancing of the interim harm. Accordingly, we affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. ALADS and the OIG

ALADS is an employee organization representing LASD deputies. The OIG, created by the County of Los Angeles ordinance to provide independent oversight of and reporting about LASD's operations (L.A. County Code, § 6.44.190), serves as the investigative arm of the LASD Civilian Oversight Committee (COC).[3] (*Ibid.*) The same ordinance requires LASD to "cooperate with the OIG and promptly provide any information or records requested by the OIG, including confidential peace officer personnel records," further stating that "confidentiality of peace officer personnel records . . . and all other privileged or confidential information" OIG receives "shall be

---

[2]    We use the term "bargain" interchangeably with "meet and confer," as do the parties and prior reported decisions. As we explain later, in the context of the MMBA, the term refers only to an attempt to reach an agreement, and the employer ultimately has the power to reject employee proposal on any given issue.

[3]    The COC consists of members appointed by the Los Angeles County Board of Supervisors. Its purpose is to improve public transparency and accountability with respect to LASD.

4

safeguarded . . . as required by law." (L.A. County Code, § 6.44.190(I) & (J).)

## B. Ballot Measure "R", ERCOM Decision, and Meet and Confer

In January of 2020, the Los Angeles County Board of Supervisors adopted County Ordinance 20-0520, conferring subpoena power on the COC and the inspector general.

In July 2020, ALADS filed a charge with ERCOM alleging that Los Angeles County violated the ERO (L.A. County Code, § 5.04.240) by implementing the new ordinance without first meeting and conferring with ALADS about its effects.

In November 2022, ERCOM issued its decision, finding Los Angeles County had violated the ERO by failing to negotiate the effects of the legislation with ALADS and ordered the county to meet and confer, expressing its "expectation that negotiations will be completed no later than [60] days from the[ir] commencement."  ERCOM further ruled that the deputies were not required to respond to any subpoenas served under the new legislation until the completion of the meet-and-confer process.

Los Angeles County agreed to meet and confer with ALADS on May 9, 2023.  Before the meeting, ALADS sent a draft policy it proposed LASD adopt.  At the meeting, the county rejected the proposal but made no counterproposal, stating that it would require time to prepare one.

## C. The May 12, 2023 Letter and Resulting ERCOM Charge

On May 12, 2023, without negotiating or providing notice to ALADS, the OIG sent letters to 35 deputies.  Citing Penal Code sections 13670 and 13510.8, the letter directed the deputies "to participate in an interview" "to establish the membership of

5

the Banditos and Executioners" (names of alleged law enforcement gangs), and advised that the deputies "must appear and answer questions," unless they assert their Fifth Amendment right, in which case the deputies "will be recalled at a future date."

The OIG's letter contained such interview questions as: "Do you have a tattoo related to the Banditos or the Executioners anywhere on your body?" "Did you ever have [any such] tattoo . . . removed, altered, or covered?" "Who else have you seen the tattoo on?" "Have you ever been told about other deputies who might be in . . . the [Banditos or Executioners]?" The letter further advised that a deputy's "failure to answer may adversely affect [his] employment with Los Angeles County or [his] status as a certified peace officer." The letter instructed the deputies to "bring a photograph of any tattoos on your . . . leg[s] from the area of the ankle to the knee and a photograph of any tattoo anywhere on your body that has" a symbol or image resembling those in the photos attached to the letter. The letter informed the deputies they would be subject to inspection of their legs at the interview.

On May 18, 2023, Sheriff Luna sent the deputies an email, ordering them to cooperate in the OIG's interviews and reminding them that under Civil Service Rule 18.031 and County of Los Angeles Department of Human Resources Policy Procedures and Guidelines, their failure to cooperate may subject them to disciplinary action, including discharge.

On May 19, 2023, ALADS filed an unfair labor practice claim with ERCOM alleging that the county violated ERO section 5.04.240(A) by sending the OIG May 12, 2023 letter without first negotiating with ALADS.

6

## D. ALADS' Lawsuit and the Trial Court's Ruling on Its Requests for Injunctive Relief

On May 22, 2023, ALADS sued Los Angeles County, Sheriff Luna, the Office of the Inspector General of Los Angeles County (OIG), and Inspector General Max Huntsman (collectively, the County) for declaratory and injunctive relief.

ALADS' first cause of action seeks declaratory and injunctive relief related to the deputies' rights under the Fourth and Fifth Amendments, their right to privacy under the California Constitution, and their rights under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). The second cause of action seeks traditional mandamus on grounds that the planned interrogations "constitute significant and adverse changes to the terms and conditions of employment of ALADS-represented [deputies]," such that the interrogations are "mandatory subjects of bargaining pursuant to the [MMBA] as well as [the ERO], section 5.04.240(A)."

On June 1, 2023, ALADS filed an ex parte application for temporary restraining order (TRO) and an order to show cause (OSC) re: preliminary injunction to enjoin defendants from conducting the interviews outlined in the OIG's May 12, 2023 letter and requiring production of photos of the deputies' tattoos and inspection of the deputies' legs.

On June 2, 2023, the trial court issued the TRO and scheduled an OSC re: preliminary injunction for June 29, 2023, specifying that it rejected the Fifth Amendment as a basis for granting the TRO and OSC, but would hear argument on the other grounds. Defendants filed an opposition to the OSC re: preliminary injunction.

7

On June 26, 2023, the American Civil Liberties Union of Southern California (ACLU) filed an ex parte application to file an amicus brief in support of defendants' opposition, which the trial court ultimately granted.

During the June 29, 2023 OSC hearing, the trial court inquired about the scope of the photographs sought from the deputies, and the County reported that, since issuing the May 12, 2023 letter, it had agreed to narrow its request, from photographs of tattoos anywhere on the deputies' bodies to photographs on the "shoulder to arm, . . . face, neck, and legs from the knees and below." After argument, the trial court took the matter under submission.

In its July 10, 2023 written ruling, the trial court concluded ALADS had not shown a likelihood of success on the merits of its Fourth Amendment, right to privacy, or *Pitchess* claims, but that it had shown such a likelihood on its claim under the MMBA and ERO. Specifically, the court held: "Whether the manner of the . . . interviews is a matter subject to bargaining, the consequences of those interviews include the duty to cooperate on pain of discipline, the discretionary application of discipline and its range, and the referral to POST for possible decertification, all of which are easily the subject of bargaining." Recognizing that "irreparable harm [would result] from the County's failure to meet and confer" before implementing its interviews, and that "there is no compelling need for immediate investigation," the court concluded that "[t]he balancing of the harms works in favor of a preliminary injunction that will maintain the status quo." The trial court issued a preliminary injunction enjoining the OIG's interviews of the deputies "until the County completes its

effects bargaining or . . . until ERCOM decides the [unfair labor practice claim], whichever occurs first."

Defendants filed a timely notice of appeal.

## II.   DISCUSSION

This appeal addresses only the trial court's grant of a preliminary injunction based on the merits of plaintiff's labor claim, the sole ground upon which the trial court issued its preliminary injunction.  Defendants and Amici Curiae argue the trial court erred in both its assessment of the merits of plaintiff's claim under the MMBA and ERO and its balancing of the relative harms to the parties and the public.

### A. Standard of Review and General Principles

A preliminary injunction aims to preserve the status quo until a final determination of the merits of the action. (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 528 (*Continental Baking*).)  "In deciding whether to issue a preliminary injunction, a trial court weighs two interrelated factors: the likelihood the moving party ultimately will prevail on the merits, and the relative interim harm to the parties from the issuance or nonissuance of the injunction."  (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 999.)  These two factors operate on a sliding scale:  "[T]he more likely it is that [the party seeking the injunction] will ultimately prevail, the less severe must be the harm that they allege will occur if the injunction does not issue." (*King v. Meese* (1987) 43 Cal.3d 1217, 1227; accord *Butt v. State of California* (1992) 4 Cal.4th 668, 678.)  A plaintiff seeking a preliminary injunction must generally show a risk of irreparable harm in the absence of injunctive relief pending adjudication of the merits.  (*White v. Davis* (2003) 30 Cal.4th 528, 555; see also *Tahoe Keys Property Owners' Assn. v. State Water Resources*

*Control Bd.* (1994) 23 Cal.App.4th 1459, 1471 (*Tahoe Keys*) ["In general, if the plaintiff may be fully compensated by the payment of damages [if] he prevails, then preliminary injunctive relief should be denied"].)

The grant or denial of a preliminary injunction is not an adjudication of the ultimate rights in controversy; it is merely a determination by the court, balancing the respective equities of the parties, that the defendant should or should not be restrained from exercising a claimed right. (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 206; *Continental Baking*, *supra*, 68 Cal.2d at p. 528.)

We review a trial court's order granting a preliminary injunction for abuse of discretion, but review any subsidiary factual findings for substantial evidence and any subsidiary legal questions de novo. (*Tulare Lake Canal Co. v. Stratford Public Utility Dist.* (2023) 92 Cal.App.5th 380, 402-403; *Integrated Dynamic Solutions, Inc. v. VitaVet Labs, Inc.* (2016) 6 Cal.App.5th 1178, 1184; *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711 [abuse of discretion "is not a unified standard," but rather calls for deference that "varies according to the aspect of a trial court's ruling under review"].)

## B. The MMBA and Its Applicability to Law Enforcement Unions

### 1. *"Scope of Representation"*

The MMBA requires a public employer and employee representatives "to meet and confer in good faith about a matter within the 'scope of representation,' concerning, among other things, 'wages, hours, and other terms and conditions of employment.'" (*Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623, 628 (*Claremont*); Gov. Code,

10

§ 3504.)  Excepted from the scope of representation are "consideration of the merits, necessity, or organization of any service or activity provided by law or executive order" (Gov. Code, § 3504), or what courts have called "fundamental managerial or policy decision."  (*Building Material & Construction Teamsters' Union v. Farrell* (1986) 41 Cal.3d 651, 660 (*Building Material*); *Claremont*, at p. 628; *County of Sonoma v. Public Employment Relations Board* (2022) 80 Cal.App.5th 167, 178; *Santa Clara County Correctional Peace Officers' Assn., Inc. v. County of Santa Clara* (2014) 224 Cal.App.4th 1016, 1029 (*County of Santa Clara*).)

"The obligation to bargain 'in good faith' means that the parties must genuinely seek to reach agreement, but the MMBA does not require that an agreement actually result in every instance, and it recognizes that a public employer has the ultimate power to reject employee proposals on any particular issue."  (*International Assn. of Fire Fighters, Local 188, AFL-CIO v. Public Employment Relations Bd.* (2011) 51 Cal.4th 259, 271 (*International Assn. of Fire Fighters*).)

"The definition of 'scope of representation' and its exception are 'arguably vague' and 'overlapping.' "  (*Claremont*, *supra*, 39 Cal.4th at p. 631, quoting *Building Material*, *supra*, 41 Cal.3d at p. 658.)  " ' "[W]ages, hours and working conditions," . . . broadly read[,] could encompass practically any conceivable bargaining proposal; and "merits, necessity or organization of any service" . . . , expansively interpreted, could swallow the whole provision for collective negotiation[,] . . . relegat[ing] determination of all labor issues to the city's discretion.' "  (*Claremont*, at p. 631, quoting *Fire Fighters Union v. City of Vallejo* (1974) 12 Cal.3d 608, 615.)

11

*Claremont* involved whether implementation of a study intended to determine the existence of racial profiling triggered the MMBA's meet-and-confer requirement. (*Claremont*, *supra*, 39 Cal.4th at pp. 628-629.) The study required police officers on all vehicle stops to complete a preprinted scantron form that included questions about the driver's " 'perceived race/ethnicity,' and the 'officers' prior knowledge of driver's race/ethnicity' "; the form took on average of two minutes to complete and was traceable to the officer who made the stop. (*Id.* at pp. 629, 638.) The Supreme Court observed the record lacked any "evidence regarding what effects would result from implementing the [s]tudy; for instance, whether the data collected and later analyzed will result in discipline if an officer is found to have engaged in racial profiling, or whether the City will publicize the Study's raw data. . . . Nor [could it] say that racial profiling studies have been so historically associated with employee discipline that their implementation invariably raises disciplinary issues." (*Id.* at p. 634.) The court concluded the city was not required to meet and confer before implementing the study because "there was no significant and adverse effect," as "the impact on the officers' working conditions was de minimis." (*Id.* at pp. 638-639.) Accordingly, it had no occasion to balance the city's need for unencumbered decision making against the benefit to employer-employee relations from bargaining on the issue. (*Id.* at p. 639.) The court "emphasize[d] the narrowness of [its] holding," and that it was not deciding "whether such a duty would exist should issues regarding officer discipline, privacy rights, and other potential effects" arise after the study's implementation. (*Ibid.*)

12

In his concurrence in *Claremont*, Justice Moreno underscored the narrowness of the court's holding, including its observation that there was no obvious link between implementation of the study and officer discipline, and further cautioned: "the use of the study as an additional basis for discipline would give rise to a duty on the City's part to meet and confer," because "a new basis for disciplining police officers goes to the heart of officers' employment security, and is therefore one of the critical 'terms and conditions of employment' at the core of Government Code section 3504." (*Claremont, supra*, 39 Cal.4th at pp. 639-640 (conc. opn. of Moreno, J.).) "Although the City plainly has the authority and responsibility to discipline officers who persistently engage in racial profiling, its unfettered right to do so does not outweigh the Association's interest in ensuring, through negotiations with the City, that any such discipline follows due process and that the study results have been accurately and fairly analyzed." (*Id.* at p. 640.)

Consistent with Justice Moreno's concurrence, other reported decisions have found management directives impacting employee discipline triggered the MMBA's meet and confer requirements. (*City of Palo Alto v. Public Employment Relations Bd.* (2016) 5 Cal.App.5th 1271, 1296 [city failed to meet its obligation under MMBA by not meeting and conferring in advance with firefighters' union before sponsoring a ballot measure that repealed provision requiring binding arbitration upon impasses in negotiations]; *Holliday v. City of Modesto* (1991) 229 Cal.App.3d 528, 530, 540 (*Holliday*) [implementation of mandatory drug testing subject to meet-and-confer requirements]; *Vernon Fire Fighters v. City of Vernon* (1980) 107 Cal.App.3d 802, 815 (*Vernon*) [adoption of disciplinary rule

prohibiting employee's use of facilities for personal purposes was subject to bargaining] cf. *San Jose Peace Officer's Assn. v. City of San Jose* (1978) 78 Cal.App.3d 935, 941(*San Jose Peace Officer's Assn.*) [change in use-of-force policy was primarily a matter of public safety, and was a fundamental managerial decision not subject to bargaining].)

**2.** ***MMBA Administrative Oversight: the ERO and PERB***

Throughout California, "[t]he MMBA is administered by PERB [(the Public Employee Relations Board)], a quasi-judicial administrative agency modeled after the NLRB [(National Labor Relation Board)]." (*County of Los Angeles v. Los Angeles County Employee Relations Com.* (2013) 56 Cal.4th 905, 916 (*County of Los Angeles*).) The statute bringing the MMBA within PERB's authority expressly does not apply to Los Angeles County (*id.*; Gov. Code, § 3509, subd. (d)), and also exempts peace officers from PERB's exclusive jurisdiction. (Gov. Code, § 3511, *County of Santa Clara, supra,* 224 Cal.App.4th at p. 1026.) The MMBA authorizes public agencies to adopt their own rules and regulations to administer employer-employee relations consistent with the principles of MMBA. (Gov. Code, §§ 3507, 3509, subd. (d).)

In 1971, Los Angeles County "passed its own ordinance conforming to the legislative policies expressed in the MMBA . . . creat[ing] ERCOM to administer its provisions." (*County of Los Angeles*, *supra*, 56 Cal.4th at p. 916; *City of Los Angeles v. City of Los Angeles Employee Relations Bd.* (2016) 7 Cal.App.5th 150, 159-160.) ERCOM, not PERB, has jurisdiction to decide charges of unfair labor practices that arise during Los Angeles County employment. (See Gov. Code, § 3509;

14

*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1077.)

Under the ERO, "[a]ll matters affecting employee relations, including those that are not subject to negotiations, are subject to consultation between management representatives and the duly authorized representatives of affected employee organizations. Every reasonable effort shall be made to have such consultation prior to effecting basic changes in any rule or procedure affecting employee relations." (L.A. County Code, tit. 5, ch. 5.04, § 5.04.090(A).) The scope of negotiation includes "wages, hours, and other terms and conditions of employment within the employee representation unit." (*Id.*, § 5.04.090(B).)

The ERO makes it "an unfair employee relations practice" for the county to, among other things, "refuse to negotiate with the representatives of certified employee organizations on negotiable matters." (L.A. County Code, tit. 5, ch. 5.04, 5.04.240(A)(3).)

ERCOM performs the same function for the Los Angeles County as PERB does for other public employers in the State. (*County of Los Angeles*, *supra*, 56 Cal.4th at p. 913, fn. 5.) PERB decisions are persuasive authority on legal matters within its area of expertise. (*City of Palo Alto, supra,* 5 Cal.App.5th at p. 1288.) We grant ALADS' request for judicial notice of various PERB decisions.

## C. Penal Code Sections 13670 and 13510.8

Penal Code section 13670, enacted with legislative recognition that "[l]aw enforcement gangs have been recognized by the Los Angeles Sheriff's Department as damaging to the trust and reputation of law enforcement throughout California" (Stats. 2021, ch. 408, § 1), requires law enforcement agencies to

15

maintain policies prohibiting participation in "a law enforcement gang," and to "cooperate" with investigations into gangs by inspectors general or any other authorized agency.  (Pen. Code, § 13760, subd. (b).)  Penal Code section 13510.8, which requires that by January 1, 2023, the Commission on Peace Officer Standards and Training (POST)[4] "adopt by regulation a definition of 'serious misconduct' that shall serve as the criteria to be considered for ineligibility for, or revocation of, certification," the definition which shall include "[p]articipation in a law enforcement gang."  (Pen. Code, § 13510.8, subd. (b)(7), added by Stats. 2021, ch. 409, § 13.)  Penal Code section 13510.8 further states that, "[b]eginning no later than January 1, 2023, each law enforcement agency shall be responsible for the completion of investigations of allegations of serious misconduct by a peace officer, regardless of their employment status." (*Id.*, subd. (c)(1).)

Neither section 13670 nor section 13510.8 of the Penal Code mentions the MMBA or any intended impact on pre-existing laws governing employer-employee relations.

---

[4]     POST consists of "15 members appointed by the Governor, after consultation with . . . the Attorney General and with the advice and consent of the Senate."  (Pen. Code, § 13500.)  Its purpose includes "raising the level of competence of local law enforcement officers" by "adopt[ing] . . . rules establishing and upholding minimum standards relating to . . . moral fitness." (Pen. Code, § 13510.)  POST's authority includes certifying and revoking certification of peace officers.  (Pen. Code, § 13510.1.)

**D. Analysis**

The County argues "the trial court erred in enjoining the OIG's investigation based on an obligation to engage in effects bargaining."

**1.** *Merits of Plaintiff's Labor Claim*

Relying on various Court of Appeal and PERB decisions, the trial court concluded the subject interviews—targeting 35 specific individuals with questions about their own and their colleagues' affiliations with law enforcement gangs—affect discipline so as to trigger the obligation to meet and confer under the MMBA and ERO, even though the OIG's decision to investigate was not itself negotiable.[5] (See, e.g., *Rio Hondo Community College Dist.* (2013) PERB Dec. No. 2313 at pp. 14-16 [use of surveillance footage for disciplinary purposes was negotiable effect of nonnegotiable decision to install cameras]; *American Federation of State, County and Municipal Employees v. Regents of University of California* (2021) PERB Dec. No. 2783H at pp. 32-33 [University of California violated the MMBA by failing to meet and confer over effects of implementing mandatory vaccine policy]; *El Dorado County Deputy Sheriff's*

---

[5] PERB is " ' " ' "one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect." ' " ' " (*People ex rel. Internat. Assn. of Firefighters, etc. v. City of Palo Alto* (2024) 102 Cal.App.5th 602, 617.) Thus, "[c]ourts generally defer to PERB's construction of labor law provisions within its jurisdiction." (*County of Los Angeles, supra,* 56 Cal.4th at p. 922.) Federal administrative decisions interpreting analogous provisions of the NRLA are also persuasive authority. (*Id.* at p. 917.)

*Assn v. County of El Dorado* (2016) 244 Cal.App.4th 950, 956 ["The public employer's duty to bargain arises under two circumstances: (1) when the decision itself is subject to bargaining, and (2) when the effects of the decision are subject to bargaining, even if the decision, itself, is nonnegotiable"].)

At the outset, we reject ALADS' argument that the balancing test in *Claremont* does not apply because its decision to interview the 35 deputies qualified as a "decision[] directly defining the employment relationship, such as wages, workplace rules, and the order of succession of layoffs and recalls," decisions which *International Assn. of Fire Fighters, supra,* 51 Cal.4th at page 272 identified as "always mandatory subjects of bargaining." The decision to investigate law enforcement gangs plainly falls outside the scope of representation, as it is mandated by California legislation. (Pen. Code, §§ 13670, 13510.8.) ALADS concedes as much, but nonetheless urges that the decision to implement the investigation "adds to the disciplinary framework" of Penal Code section 13670 so as to trigger decisional bargaining. We find this argument difficult to follow, and do not find any elucidation or support for it in any of the authorities ALADS cites.[6] We agree with the County that the deputy

---

[6] Five years after *Claremont*, the California Supreme Court "identified three categories of management decisions." (*International Assn. of Fire Fighters*, *supra*, 51 Cal.4th at p. 272*; First National Maintenance Corp. v. NLRB* (1981) 452 U.S. 666, 676-680.) These are (1) decisions "that 'have only an indirect and attenuated impact on the employment relationship' and thus are not mandatory subjects of bargaining," such as " 'choice of advertising and promotion, product type and design, and financing arrangements' "; (2) "decisions directly defining the

18

interviews implicate a fundamental managerial or policy decision and thus turn to the questions of whether they give rise to a significant and adverse effect on working conditions and are thus subject to the balancing test in *Claremont.*

a. Significant and adverse effects on working conditions

Unlike the study at issue in *Claremont*, which required all officers to fill out short, preprinted forms to facilitate the "determin[ation of] whether officers engaged in racial profiling," the interviews here target specific deputies with questions about their personal affiliations with law enforcement gangs.

---

employment relationship, such as wages, workplace rules, and the order of succession of layoffs and recalls," which are "always mandatory subjects of bargaining"; and (3) "decisions that directly affect employment, such as eliminating jobs, but nonetheless may not be mandatory subjects of bargaining because they involve 'a change in the scope and direction of the enterprise,' or . . . the employer's 'retained freedom to manage its affairs unrelated to employment,' " which decisions do not require bargaining "if they do not raise an issue that is 'amenable to resolution through the bargaining process' [citation], although the employer is normally required to bargain about the results or effects of such decisions." (*International Assn. of Fire Fighters*, at pp. 272-273.)  The court did not attempt to reconcile this framework with the test it articulated in *Claremont*, nor has any appellate court since.  We acknowledge that a recent PERB decision has concluded that the *Claremont* test applies only to the third type of decision articulated in *International Assn. of Fire Fighters* (*Santa Clara County District Attorney Investigators' Association* (2021) PERB Dec. No 2799-M), but decline to opine on the correctness of that conclusion here because if the interviews at issue here belong to any of the three categories, they belong to the third.

Significantly, the interview directive further requires deputies to identify their colleagues who may have gang tattoos or affiliations.  The OIG's letter directing the deputies to appear for these interviews cites new legislation that expressly prohibits deputies' membership in gangs and mandates disciplinary action on that basis (Pen. Code, §§ 13670, 13510.8).  The subject interviews, with such a close link to disciplinary action, have a "significant and adverse effect" on working conditions.  (See *Claremont*, *supra*, 39 Cal.4th at pp. 639-640 (conc. opn. of Moreno, J.) ["a new basis for disciplining police officers [is] . . . one of the critical 'terms and conditions of employment' at the core of Government Code section 3504"]; *Holliday, supra,* 229 Cal.App.3d at p. 540 [order that firefighter submit to drug testing was subject to meet-and-confer requirement under MMBA]; *Vernon*, *supra*, 107 Cal.App.3d 802 [the adoption of a disciplinary rule prohibiting use of city facilities for personal purposes triggered meet-and-confer requirement].)

We agree with the trial court that, "[t]here is a difference between meeting and conferring over the adoption of Penal Code section 13670 and the OIG's decision to conduct an investigation – which is clearly a managerial decision – and the effects of a policy directing the . . . [d]eputies to an interview pursuant to that statute.  The OIG's decision to implement Penal Code section 13670 is not subject to bargaining, but the effects of that decision and the manner in which the County implements that decision are."

We are not persuaded by the County's argument that the issue is not ripe for bargaining because "there is no evidence in the record as to what th[e] potential discipline could be because the County has not yet made a firm decision."  Our Supreme

20

Court has made clear that a "bargaining unit can be adversely affected without any immediate adverse effect on any particular employee within that unit." (*Building Material*, *supra*, 41 Cal.3d at p. 662; see also *Claremont*, *supra*, 39 Cal.4th at p. 640 (conc. opn. of Moreno, J.) ["adoption of a new *basis* for disciplining police officers" would give "rise to a duty . . . to meet and confer," italics added].) For example, in the recent decision of *Sonoma County Deputy Sheriff's Association* (2023) PERB Dec. No. 2772aM, PERB found that the County of Sonoma violated the MMBA by placing a measure on the ballot to enhance the investigatory power of the county's independent investigatory office without first meeting and conferring with the sheriff's employee organization because "new investigative procedures adversely affect employment when they create *a potential* for discipline that did not previously exist." (*Id*. at p. 19, italics added.)

We agree with the trial court that the relevant decision here is not to discipline any particular deputy, but rather the decision the OIG has made to investigate two alleged law enforcement gangs under Penal Code section 13670 by requiring the deputies to participate in interviews, and to answer questions, on pain of discipline, not only regarding their own gang affiliations, but also regarding gang affiliations of their colleagues.

We also agree with the trial court's observation that "[a]part from a new discipline for participation in a law enforcement gang, the significant and adverse effects of the OIG's interviews include whether the statements can be transmitted to POST without violating POBRA's prohibition on using compelled statements in subsequent civil proceedings [(Gov. Code, 3303,

21

subd. (f))], and whether any statements can be transmitted in a report to the District Attorney for inclusion on the *Brady* [l]ist." That these issues may involve legal interpretation does not necessarily exempt them from the scope of representation. (See *County of Ventura* (2021) PERB Dec. No. 2758-M at pp. 56-57 [public employer's decision to withhold taxes on accrued paid leave pursuant to IRS regulation was subject to effect bargaining, even though employer's failure to do so could subject it to statutory fines and penalties].)

b. *Claremont* balancing

The County argues that its "need for unencumbered decision-making in managing its operations through OIG's various investigative channels outweighs any benefit to employer-employee relations that bargaining would provide, even as to implementation of the decision." It cites "[t]he fundamental policy decision by the State, as evidenced by the passage of Penal Code section 13670, to remove the widespread evils presented by law enforcement gangs," which the County likens to "the State's need to avoid unnecessary deadly force." Penal Code section 13670 does not mention, let alone purport to exempt its implementation from, the meet-and-confer requirements of the MMBA.

The County relies on *San Francisco Police Officers' Assn. v. San Francisco Police Com.* (2018) 27 Cal.App.5th 676, 690 (*San Francisco Police Officers' Assn.*), in which the court observed that "decisions involving 'the avoidance of unnecessary deadly force are of obvious importance, and directly affect the quality and nature of public services. *The burden of requiring an employer to confer about such fundamental decisions clearly outweighs the benefits to employer-employee relations that*

*bargaining would provide.'* " (*Ibid.*, quoting *Building Material, supra*, 41 Cal.3d at p. 664; *San Jose Peace Officer's Assn., supra*, 78 Cal.App.3d at p. 948.) *San Francisco Police Officers' Assn.* is distinguishable in multiple ways. The use-of-force policy at issue was purely prospective, and applied to an entire police department (*id.* at p. 680)—much unlike the interviews here, which are directed at 35 specific deputies and which seek disclosures about their own and their colleagues' past and present participation in alleged law enforcement gangs, participation which the Penal Code now prohibits and makes a ground for termination. The policy at issue in *San Francisco Police Officers' Assn.* was one prohibiting "carotid hold[s] and shooting at moving vehicles," but there is no indication that the policy required deputies to self-report on their own or their colleagues' use of such measures, which would be more akin to the interview questions at issue here. (*Id.* at p. 681.) The immediate "policy" at issue here is not the prohibition of law enforcement gangs, or even the propriety of the OIG investigating them; rather, it is the effects of the specific implementation of the OIG's investigatory authority, in the form of interviews requiring deputies to disclose their personal affiliations as well as those of their colleagues, that are at issue. In short, the matter at hand bears no meaningful similarity to *San Francisco Police Officers' Assn.*

As the trial court observed, the "manner of the . . . interviews can be a management decision not subject to bargaining" to the extent it concerns the interviews' reliability and integrity. (See *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2008) Cal.App.4th 1625, 1644 (*ALADS*) [no meet and confer required for decision to implement policy

prohibiting deputies who were involved in or witnessed a deputy-involved shooting from consulting with legal counsel in groups (anti-huddling policy), which primarily concerned integrity of investigatory process]; *Association of Orange County Deputy Sheriffs v. County of Orange* (2013) 217 Cal.App.4th 29, 45 [policy terminating access to investigative file for deputies who are under investigation for misconduct].) Here, however, the implementation of interviews raises questions that are much more closely tied to employee-employer relations than to the integrity of the OIG's investigation—e.g., the referral to POST for possible decertification and the disciplinary ramifications of failure to identify fellow officers as gang members. We agree with the trial court that "[t]he County does not have a need for unencumbered decision-making with respect to these consequences."

c. Trial court's consideration of the 2022 ERCOM decision

The County argues that the trial court improperly relied on ERCOM's 2022 decision and on the comments of ERCOM commissioners in a May 2023 hearing.

The trial court cited the 2022 ERCOM decision as "support" for its own conclusion, appropriately recognizing that although the decision, "is not controlling," it is "evidence that ERCOM has applied its expertise to conclude that the County must bargain for the effects of the OIG's exercise of new authority in investigating law enforcement gangs. It is not hard to expand this conclusion to the effects of OIG's decision to compel the [deputies] to submit to an interview and show their arms and legs pursuant to Penal Code section 13670, LACC section 6.44.190(1), . . . and the Sheriff's order."

Nothing about the trial court's consideration of ERCOM's decision was improper. The trial court fully recognized that it was not bound by ERCOM's decisions, but that similar to PERB, ERCOM possesses expertise that gives its decisions some persuasive value.

The County points out that the 2022 ERCOM decision concerned subpoenas issued under "laws adopted through different legislative channels," but fails to explain the import of this distinction, and we can discern none. Neither in this case nor in the 2022 ERCOM case was the legislation itself being challenged; both cases concern the effects of the County's implementation of the legislation.

The trial court also considered comments by ERCOM commissioners at a hearing on May 22, 2023, stating that the OIG's May 12, 2023 letter appeared to be an " 'end around' " ERCOM's decision and that ERCOM's intent was not to delay the investigation, but to encourage expeditious effects bargaining. The trial court attributed to these comments only "minimal value," recognizing that the commissioners were " 'shooting from the hip.' " We see no impropriety here, and the County cites no authority to persuade us otherwise.

### 2. *Interim Harm*

We find the trial court acted within its discretion in balancing the harm in favor of the meet-and-confer requirements impacting public employees under the MMBA. "[F]ailure to bargain in good faith[] has long been understood as likely causing an irreparable injury to union representation." (*Frankl v. HTH Corp.* (9th Cir. 2011) 650 F.3d 1334, 1362; accord *Small v. Avanti Health Systems* (9th Cir. 2011) 661 F.3d 1180, 1192.) Whether or not an employer bargains with its employees' union is normally

decisive of the union's ability to secure and retain its members. (*In re Karp Metals* (1943) 51 NLRB 621, 624.) "[T]he result of an unremedied refusal to bargain with a union . . . is to discredit the organization in the eyes of the employees . . . ." (*Ibid*.) The trial court appropriately observed that unless it granted the preliminary injunction, ALADS would be unable to benefit from an ERCOM ruling in its favor on claims that the trial court determined had a probability of prevailing.[7]

As the trial court acknowledged, the harm to the public of delaying the OIG's investigation must also be considered. (See, e.g., *Tahoe Keys*, *supra*, 23 Cal.App.4th at pp. 1472-1473 [where "the plaintiff seeks to enjoin public officers and agencies in the performance of their duties[,] the public interest must be considered"].) The trial court determined that juxtaposed with the irreparable harm posed by the County's failure to meet and confer before implementing its investigation, "there is no compelling need for immediate investigation," particularly given "the slow course of th[e OIG's] investigation."

We agree with the County and the ACLU that the public's interest in ridding law enforcement agencies of gangs is substantial, and that it was incumbent upon the trial court to consider that important public interest.[8] (See *O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1468 [trial court

---

[7] ERCOM does not have the authority to issue a TRO or preliminary injunction against the OIG during the pendency of its 2023 unfair labor practice claim.

[8] We permitted ACLU to file an amicus brief (and ALADS a response thereto), in which ACLU addressed only the balancing-of-the-harm prong of the trial court's decision to grant the preliminary injunction.

failed to take into account public interest in enforcing a high school diploma requirement as part of the statutory scheme adopted by Legislature to raise academic standards]; *Tahoe Keys*, *supra*, 23 Cal.App.4th at pp. 1472-1473 [affirming denial of preliminary injunction against collecting fee from lot owners to mitigate pollution; no evidence suggested owners could not be paid damages if they prevailed, whereas enjoining collection of fees would deter or delay attempts to preserve or mitigate the degradation of Lake Tahoe].)

We conclude, however, that the trial court duly considered this interest, as shown by its express recognition that "the OIG's need to investigate . . . is significant." Critically, the trial court enjoined the interviews from taking place pending *either* the adjudication of ALADS' claim with ERCOM *or* the completion of the meet-and-confer process, thereby allocating to the OIG some degree of control in furthering its own investigation. In its November 2022 written decision, ERCOM expressed its expectation that negotiations on a similar issue should take no longer than 60 days to complete. The trial court recognized the lack of any evidence in the record to suggest the effects bargaining could not be performed expeditiously so that the OIG may proceed with its investigation. We cannot say on the record before us that the trial court's conclusion " 'exceeded the bounds of reason.' " (*ALADS*, *supra*, 166 Cal.App.4th at p. 1634.)

## III.  DISPOSITION

The order is affirmed.  The parties are to bear their own costs on appeal.

**CERTIFIED FOR PUBLICATION**

DAVIS, J.*

We Concur:

MOOR, Acting P. J.

KIM, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to Article VI, section 6 of the California Constitution.